IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JENNIFER BROWN | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 16-946 |
| THE VANGUARD GROUP, INC., ET AL. | : | |

**MEMORANDUM**

**SURRICK, J.**                                                              **JANUARY 30 , 2017**

Presently before the Court is Defendants' Motion for Summary Judgment.  (ECF No. 10.)
For the following reasons, the Motion will be granted.

**I.      BACKGROUND**

In this disability discrimination action, Plaintiff complains that she was disciplined and
terminated because of her depression, social anxiety, and agoraphobia.  She asserts claims for
discrimination, retaliation, and harassment under the ADA, the PHRA, and the FMLA against
both her former employer, Vanguard, and her former supervisor.  After a review of the
voluminous summary judgment record—which reveals a protracted history of performance
concerns that began prior to Plaintiff's disclosure of her disabilities—we are satisfied that no
reasonable juror would conclude that Plaintiff's discipline and ultimate termination were the
result of discriminatory animus based upon Plaintiff's disabilities.

**A.      Factual Background**

Plaintiff worked as an information designer at Vanguard from October 2011 until her
termination in August 2014.  (Compl. ¶¶ 16, 18, ECF No. 1; Brown Dep. 41, 52, Pl.'s Resp. Ex.
A, ECF No. 11.)  Plaintiff worked on the "User Interface" or UI Design Team, which designed
internal websites and software used by Vanguard employees.  (Brown Dep. 52-53.)  In this

position, Plaintiff dealt with computer programmers and clients, who were internal Vanguard department heads that requested web or software projects.  (*Id*. at 53.)  Work done by the UI Design Team requires collaboration both with clients and with teammates.  (*Id*. at 81-82.) When Plaintiff began at Vanguard, her direct supervisor was Marcia Morelli.  (*Id*. at 52.)  In March or April of 2013, Morelli was transferred to another department within Vanguard, and Srinath Chigullapalli became Plaintiff's supervisor.  (Morelli Dep. 19, Pl.'s Resp. Ex. E; Chigullapalli Dep. 8, Pl.'s Resp. Ex. C; Brown Dep. 52, 215.)

1.    *Plaintiff's Work at Vanguard Under Morelli as Supervisor*

Plaintiff did "high quality" design work when she began working at Vanguard.  (Morelli Dep. 29.)  In June 2012, Plaintiff received a Midyear Update from Morelli.  (*Id*. at 52-53.)  The evaluation was positive overall.  (June 2012 Midyear Update, Pl.'s Resp. Ex. F.)  Morelli noted that Plaintiff was "a very skilled and knowledgeable designer," who "stays on schedule, and organizes her work well."  (*Id*.)  Morelli also indicated that "[w]orking in such a collaborative environment, with so much feedback coming in was a challenge to [Plaintiff] at first," but that she was "starting to adapt and find ways to work effectively with her colleagues, and with our clients."  (*Id*.)

Morelli noticed that Plaintiff's performance began to change as time progressed.  Plaintiff began to say more negative things during meetings.  (Morelli Dep. 30.)  Clients complained that Plaintiff had not produced design concepts in time for client meetings, and that she occasionally skipped the meetings.  (*Id*. at 31.)  When Morelli confronted Plaintiff with these complaints, Plaintiff made excuses, such as that she was unaware of what was expected of her, or did not know there was a deadline that she had to meet.  (*Id*. at 31-32.)  Morelli also noticed that Plaintiff had attendance issues.  (*Id*. at 39.)  Plaintiff often arrived at the office later in the day, or did not

come into the office at all.  She also frequently failed to communicate her whereabouts with her supervisor or her team.  (*Id*. at 39-40.)  Morelli testified that these attendance issues "happened pretty consistently," starting in the beginning of 2012.  (*Id*. at 40.)  Morelli recognized that Vanguard permitted flexible schedules, but as it applied to Plaintiff, "that didn't mean you could just totally come and go as you pleased."  (*Id*. at 46.)[1]  Morelli addressed Plaintiff's attendance issues with her.  (*Id*. at 39.)  Morelli also stated that Plaintiff did not like receiving feedback from her teammates or from her clients, even though Morelli had expressed to Plaintiff that receiving feedback was "a core part" of her job.  (*Id*. at 42-44.)

At the end of 2012, Morelli submitted a year-end Appraisal of Plaintiff's performance. (2012 Appraisal, Pl.'s Resp. Ex. G.)  Morelli confirmed that Plaintiff was a "skilled and knowledgeable designer," who "has great attention to detail."  (*Id*.)  Her overall rating on this Appraisal, however, was "further development needed."  (*Id*.)  At the time of the Appraisal, Vanguard's rating system ranked performance levels, from highest to lowest, as follows: "distinguished"; "fully successful"; "further development needed"; and "does not meet expectations."  (Sabin Decl. ¶ 2, Defs.' Mem. Ex. SS.)  Morelli noted that Plaintiff does not always give the project teams "enough awareness of her status."  (2012 Appraisal 6.)  Morelli also noted that "others would like to know when she is going to miss a session.  This lack of information sometimes gives the impression that she is not as reliable or responsive as others would like."  (*Id*.)  Finally, Morelli noted Plaintiff's continued difficulty in receiving feedback in a collaborative environment, and that she at times appeared "overly defensive or sensitive."  (*Id*.)

Within the first three months of her employment at Vanguard, Plaintiff confided in Morelli that she suffers from depression.  (Brown Dep. 153.)  Morelli understood the

---

[1] Members of the design teams could request flexible work schedules.  Flexible work schedules were subject to approval by the employee's supervisor.  (Brown Dep. 267.)

conversation to mean that Plaintiff had suffered from depression in the past, but was not at that time suffering from depression.  (Morelli Dep. 32.)  Plaintiff did not mention any other medical issue or disability to Morelli.  (*Id*. at 33.)  Nor did Plaintiff state that any condition interfered with her work.  (*Id*. at 37.)  Plaintiff did not request any accommodation or present a doctor's note.  (*Id*. at 34.)

Prior to transferring departments, Morelli had a "turnover meeting" with Chigullapalli, where they discussed all the employees Chigullapalli would be supervising.  (Morelli Dep. 44-46; Chigullapalli Dep. 11.)  At the meeting, Morelli expressed concerns she had about Plaintiff's performance.  Specifically, Morelli shared that Plaintiff needed to communicate her whereabouts with teammates and clients, and needed to create a more consistent schedule.  (Morelli Dep. 46.)  Morelli also shared that Plaintiff had been working from home without using the tools necessary to remotely log into the network, as was required by Vanguard.  (*Id*. at 47.)[2]  Morelli did not share with Chigullapalli that Plaintiff had confided in her about prior bouts of depression, because she did not believe it was work-related.  (*Id*. at 51.)

### 2. *Plaintiff's Work at Vanguard Under Chigullapalli as Supervisor*

Shortly after becoming Plaintiff's supervisor, Chigullapalli began to see performance deficiencies.   In May 2013, Chigullapalli learned from two managers of the United Way project team that Plaintiff never attends meetings, is very quiet if she calls into meetings by telephone, is not timely with her design deliverables, and is not open to feedback on her project designs.  (Chigullapalli Dep. 30.)  Chigullapalli shared the managers' feedback with Plaintiff, and Plaintiff denied being untimely with her work.  (*Id*.)  Chigullapalli also expressed concerns about

---

[2] When working from home, employees are required to use the option "Remote from your PC," which permits them access to the software and databases that they would have if they worked at their computer at the office.  Plaintiff would instead dial in through "Citrix," and as a result "would not have the tools to do her job" from home.  (Counselling Session Note 69909.)

Plaintiff's lack of communication with regard to her whereabouts.  As her supervisor, he found it difficult to determine Plaintiff's schedule:  "Sometimes she came in at noon.  Sometimes she came in at nine-thirty.  Sometimes she came in the afternoon.  Sometimes she just worked from home."  (*Id*. at 17.)  When she would miss meetings, she would not follow up with anybody who attended the meeting.  (*Id*. at 24.)

In June 2013, Chigullapalli gave Plaintiff a Midyear Update.  (2013 Midyear Update, Pl.'s Resp. Ex. H.)  In the evaluation, Chigullapalli noted certain strengths in Plaintiff's performance, such as her creativity and design skills.  (*Id*.)  Chigullapalli also noted some "developmental areas," which were areas where Plaintiff's performance needed improvement. (*Id*.)  In the comments section, Chigullapalli stated that Plaintiff "should keep team members and various stakeholders in her project updated with her availability status including when working from home with appropriate communication."  (*Id*.)  Chigullapalli met with Plaintiff to discuss the Midyear Update.  (Chigullapalli Dep. 62.)  He reiterated to Plaintiff that she needed to let everybody know when she was working from home, and needed to keep her teammates better informed about the status of projects.  (*Id*.)  He also advised Plaintiff about the requirements associated with working from home, such as having tools on her computer that would provide her complete remote access to all Vanguard software, and that would allow her to communicate with her teammates.  (*Id*. at 63.)  Chigullapalli instructed her not to work from home until those tools were in place.  (*Id*.)  It took Plaintiff at least six to eight weeks before gaining access to the tools; nevertheless, she continued to work from home a couple times per week without complete remote access.  (*Id*.)

3.      *Open Channel Message and Vanguard Response*

In October 2013, Plaintiff sent an anonymous message through Vanguard's Open Channel communication system.  (Open Channel Message, Pl.'s Resp. Ex. I.)  Open Channel is an electronic communication system that permits Vanguard employees to write anonymous messages to senior management.  (Sabin Dep. 61, Pl.'s Resp. Ex. L.)  Open Channel is meant to be a vehicle for employees to express concerns or suggestions, and is intended to be completely anonymous.  (*Id*. at 61.)

In Plaintiff's Open Channel Message, which spanned three-and-a-half pages, single-spaced, Plaintiff complained about her experience at Vanguard, including her teammates and supervisors, and shared some of the medical conditions from which she suffered.  (Open Channel Message.)  She stated that she felt bullied or ignored by members of her team, and not supported by her supervisors.  She acknowledged that her supervisor—Chigullapalli at the time—expressed concerns about her availability.  (*Id*. at 1 ("I am constantly told that I am not available to answer my co-workers questions.").)  Plaintiff denied being unavailable and stated that her work is great.  (*Id*.)  She complained that she was frustrated, was not treated like an adult professional, felt like she was "at a breaking point," and that "all of these workplace factors have caused me to have a very serious depression."  (*Id*. at 2.)  In addition to depression, she indicated that she suffers from severe social anxiety and a mild case of Asperger's Syndrome, which complicates her ability to communicate with others.  (*Id*.)  Plaintiff further stated that she "is not yet suicidal" but "is angry" because "[i]t's not right to treat a human being this way."  (*Id*.)  Plaintiff requested a flexible schedule because she "is not so good with 9-5 because of [her] depression."  (*Id*.)

Kathy Gubanich, the Managing Director of Human Resources, sent Plaintiff a response to her Open Channel Message.  (*Id*. at 3.)  Gubanich shared various Vanguard resources available

6

to Plaintiff, including the Crew Assistance Program ("CAP"), which provides external counseling services free-of-charge to handle work-life issues, wellness matters, and life management support.  (*Id*.)  Gubanich also suggested that Plaintiff contact Mike Sabin, who is a member of the Human Resources Department, and a Crew Relations Specialist supporting the IT Department.  (*Id*.)[3]

On October 18, 2013, Sabin met with Plaintiff about her Open Channel message.  (Sabin Dep. 63; Crew Relations Session 69434, Defs.' Mem. Ex. F.)[4]  Plaintiff expressed to Sabin that she was depressed, but was not suicidal.  (Sabin Dep. 66.)  In response, Sabin told Plaintiff about various Vanguard resources available to her, such as the CAP, short-term disability, and family medical leave.  (*Id*.)  Plaintiff told Sabin that she felt bullied by members of her team.  (Crew Relations Session 69343.)  Specifically, she indicated that Michelle Jones was "snippy" with her on one occasion and questioned her design knowledge, and Ann Gibson "ripped apart" one of Plaintiff's designs.  (*Id*.)  When Sabin inquired about Plaintiff's relationship with her supervisor, Plaintiff mentioned that Chigullapalli questioned her availability and threatened to remove her work-from-home privileges.  (*Id*.)  Sabin also provided Plaintiff with his personal cell phone number, and told her she could call him anytime.  (Sabin Dep. 68-69.)  Plaintiff did call Sabin on his cell phone on one occasion.  (*Id*.)

---

[3] Crew Relations is a "team of employee relations specialists in Human Resources" who "provide guidance and support on personal and professional matters and can help resolve work-related issues."  (Open Channel Message 3-4.)

[4] Although Open Channel communications are meant to be anonymous, exceptions are made when situations become threatening.  (Sabin Dep. 61.)  Sabin decided that Plaintiff's mention of suicide in her Open Channel Message was an instance that warranted making an exception to the anonymity policy.  (*Id*.)

In light of Plaintiff's complaints about bullying, Sabin conducted an investigation. (Sabin Dep. 64-65.)  As part of that investigation, Sabin interviewed four of Plaintiff's teammates, as well as her current and former supervisor.  (Crew Relations Session 69343.) Sabin testified that Plaintiff's teammates "were frustrated with her" because "she was never around," and that she was a "poor performer."  (Sabin Dep. 66, 95.)  One teammate told Sabin that Plaintiff gets defensive when receiving feedback, and is often not in the office.  (Crew Relations Session 69343.)  Another teammate stated that Plaintiff is "passive aggressive and rude" and that the team is frustrated with her because she often doesn't show up for meetings, or calls in and drops the call.  (*Id*.)  Another teammate shared that Plaintiff works from home often, is not engaged, and that people cannot find her.  (*Id*.)

On October 22, 2013, Sabin met with Chigullapalli as part of the investigation. (Investigation Plan, Pl.'s Resp. Ex. K.)  Chigullapalli shared with Sabin Plaintiff's various performance issues.  (*Id*.)  For example, Plaintiff failed to complete an assignment before leaving for vacation, and Chigullapalli had to pull someone from another project to complete the task on time.  (*Id*.)  Chigullapalli received complaints from teammates about Plaintiff's lack of attendance at meetings, her poor communication skills, and the fact that she has worked from home several days a week without updating her team on when she would be out of the office. Some teammates requested that she not attend their meetings in the future.  (*Id*.)  Chigullapalli shared that Plaintiff routinely arrived to work between 10:30 and 11:30, missed three status reports despite multiple reminders, worked from home without remote access, and abused her work-from-home privileges.  (*Id*.)  Chigullapalli believed Plaintiff had the skills to be successful, but that she lacked initiative.  (*Id*.)  It was at this meeting that Chigullapalli first learned from

Sabin that Plaintiff suffered from depression and other medical conditions.   (Chigullapalli Dep. 9-10.)[5]  Sabin learned about the disabilities from the Open Channel Message.

On October 29, 2013, Sabin again met with Plaintiff to explain Chigullapalli's concerns about her performance, attendance, and availability.  (Crew Relations Session 70142, Pl.'s Resp. Ex. R.)  For each of Chigullapalli's concerns, Plaintiff "had an excuse or blamed others."  (*Id.*)  She denied working from home three or four days a week, claimed she was unaware of the software requisites to work from home, and stated that she only missed one status report, not three.  (*Id.*)[6]

On November 6, 2013, Plaintiff met with Sabin and Chigulapalli for one-and-a-half hours to discuss the issues raised in her Open Channel Message, and to outline performance expectations moving forward.  (Crew Relations Session 69686, Pl.'s Resp. Ex. T.)   Sabin stated that, during the meeting, Plaintiff "took no accountability for her performance, behavior, or lack of availability."  (*Id.*)  As a follow-up to that meeting, Chigullapalli sent Plaintiff an e-mail detailing clear expectations with respect to her presence and availability.  (*Id.*)  Plaintiff was told she would have to be at work by 9:30 a.m. every day, and that if she was late, she must let everyone she was working with know, including her supervisor.  (*Id.*)  Chigullapalli gave examples of where she fell short of this requirement.  (*Id.*)[7]  In addition, Chigullapalli explained

---

[5] Plaintiff did not remember when she first told Chigullapalli about her conditions. (Brown Dep. 154-158.)

[6] Chigullapalli had explained the work-from-home requirements to Plaintiff in June during the Midyear Update, and told Plaintiff that she was not allowed to work from home until those tools were in place.  (Crew Relations Session 69909.)  Plaintiff continued to work from home despite not having the proper tools.  (*Id.*)

[7] For example, Chigullapalli wrote:  "on 9/20 when you were not on vacation but you did not let anybody know if you were [working from home] or not and you were not available all day at your desk or on crewchat.  Similarly on 9/9 when you sent an email to the team saying you

his expectations for Plaintiff's submission of weekly status reports.  He also offered to be available by phone, email, or text message if she had questions or concerns.  (*Id*.)

On November 12, 2013, Plaintiff e-mailed Sabin and Chigullapalli concerning a panic attack that she was having at a meeting.  (Crew Relations Session 69790, Pl.'s Resp. Ex. U.) Plaintiff was advised that she could go home for the day.  (*Id*.)

On December 4, 2013, Sabin e-mailed Plaintiff, advising her that he had completed the investigation into allegations of bullying, and that he concluded that no harassment or unfair treatment had occurred.  (Crew Relations Session 70192, Defs.' Mem.. Ex. S.)  After the investigation, Vanguard decided that Plaintiff would be required to use CAP for counseling in light of her mentioning suicide in her Open Channel Message.  (Counselling Session Note 69909.)

### 4. *Year-End Appraisal 2013*

On December 12, 2013, Plaintiff received her 2013 year-end Appraisal from Chigullapalli.  (2013 Appraisal, Pl.'s Resp. Ex. V.)  Plaintiff received the same rating that she had received from Morelli in her 2012 year-end Appraisal:  "further development needed."  (*Id*.) Chigullapalli noted, among other things, that Plaintiff:  "is a very skilled and knowledgeable designer," but that she "struggles to understand the roles and responsibilities of each individual assignment."  (*Id*.)  Chigullapalli noted that Plaintiff turned in poor quality designs on one project, which required multiple changes and intervention by her supervisor.  (*Id*.)   Chigullapalli stated the following in the Appraisal:

> [Plaintiff] received feedback during the mid-year review that she needed to keep everybody working with her updated on the status of her work and to make herself available for communicating during core business hours 9 AM - 4 PM.

---

will be in around 11 AM but did not come into work or let anybody know if you were [Work From Home] after that."  (Crew Relations Session 69686.)

Despite multiple reminders she was consistently late to work (frequently past noon) and also frequently missed out on communicating her correct availability. She also worked from home multiple times a week despite the feedback about her lack of availability.  During midyear she informed me that she did not have remote access to her PC when working from home.  I advised her to review the flexibility policy on the prerequisites of working from home – call forwarding, availability at core hours, access to all the tools needed to perform tasks and present via email/crewchat.  She had been working from home for almost two years without any of these and I suggested to her to not work from home till the PC remote access issues were resolved as an information designer cannot be productive without access to the tools on the work PC as citix gives access only to emails and none of the design tools.  Despite that warning, she continued to work from home multiple times a week for the next six weeks.

(*Id.*)  When Plaintiff did sign in from home with the proper remote access, her availability was "erratic at best."  (*Id.*)  She would often set her status to "in a meeting" even when she did not have meetings scheduled.  (*Id.*)

 Plaintiff was unhappy with the Appraisal.  On December 12, 2013, she expressed to Sabin that she believed that Chigullapalli was trying to have her fired.  (Crew Relations Session 70384, Pl.'s Resp. Ex. W.)  She accused Chigullapalli of basing his evaluation of her performance on "several flat out lies."  (*Id.*)  Plaintiff alleged that she "even showed this review to [her] peers and they agreed that [Chigullapalli's] characterization doesn't sound like [her] at all."  (*Id.*)  In response, Sabin sent Brown the forms to request an accommodation.  (Brown Dep. 297; Defs.' Mem. Ex. U.)[8]  When she met with Chigullapalli to discuss the review, Plaintiff denied any performance deficiencies.  According to Chigullapalli, Plaintiff never agreed to the performance gaps and was not open to feedback from him.  (Chigullapalli Dep. 53.)  This was surprising to Chigullapalli, since he and Plaintiff "had been constantly in communication" about her performance gaps and areas where she needed to improve.  (*Id.*)

---

[8] Plaintiff saw Dr. Alan Keller for the first time on December 23 or 24, 2013.  (Brown Dep. 136, 297.)  However, Plaintiff did not submit a request for an accommodation until over a month later.  (Jan. 2014 Accommodation Request, Pl.'s Resp. Ex. SS.)

5.      *Plaintiff Receives a Written Alert*

After her 2013 year-end Appraisal, Plaintiff's performance issues persisted.  During the

first week of January 2014, Chigullapalli called Sabin to discuss Plaintiff's continued

performance issues.  (Crew Relations Session 70893, Pl.'s Resp. Ex. X.)  Chigullapalli reported

that Plaintiff continued to (1) not submit status reports; (2) arrive to work later than the agreed

upon 9:30 a.m. start time; (3) "work from home whenever she wants without prior manager

approval"; and (4) not inform the team when she called out of work.  (*Id.*)  Based on these

continued performance issues, Chigullapalli decided to revoke Plaintiff's work-from-home

privileges.  (*Id.*)  Chigullapalli testified that he did this because, despite repeated warnings,

Plaintiff was simply not being productive while working from home.  (Chigullapalli Dep. 17-18.)

Sabin asked the IT department to run activity reports to determine Plaintiff's productivity during

days she worked from home.  (Sabin Dep. 101.)  He discovered that when Plaintiff worked from

home, she rarely logged in, did not attend meetings, did not produce work, and sent only a few e-

mails during those days, some of which were merely advising her supervisor that she was

working from home.  (*Id.* at 101-02.)

On January 24, 2014, Plaintiff received a Written Alert due to deficient performance.

(Written Alert, Pl.'s Resp. Ex. Y; Chigullapalli Dep. 38.)  The Written Alert provided that

Plaintiff had sixty days to improve her performance, and set forth in detail the performance gaps

that needed improvement.  (Written Alert.)  In particular, it noted Plaintiff's failure to complete

assignments on time, failure to communicate with her peers when asked to, failure to submit

status reports, failure to honor the previously agreed-upon availability times, and her poor quality

designs.  (*Id.*)  The Written Alert also specifically outlined the action steps Plaintiff needed to

take to close these performance gaps.  (*Id.*)  During the sixty-day period of the Written Alert,

Plaintiff was required to meet with her management team weekly to discuss progress on closing the performance gaps. (*Id.*) Sabin attended many of the meetings with Plaintiff and Chigullapalli. (Sabin Dep. 69-70.) At one meeting, Sabin discussed with Plaintiff that members of the SM Web Team felt uncomfortable after Plaintiff asked them why they provided performance feedback about her to Chigullapalli. Sabin advised Plaintiff that this behavior was unprofessional, and that if it continued, it could result in a Formal Warning. (Crew Relations Session 71415.)

After receiving the Written Alert, Plaintiff met with Rob Cook, Chigullapalli's direct supervisor, who encouraged Plaintiff to follow through with the action items on the Written Alert. (Brown Dep. 290-91.) Plaintiff told Cook that she felt as though she was being discriminated against. (*Id.*) Both Cook and Sabin encouraged Plaintiff to submit a request for an accommodation. (*Id.* at 296-98.)

### 6.    *Request for Accommodation*

Plaintiff submitted a request for an accommodation signed by her doctor, Dr. Alan Keller, on January 27, 2014. (Jan. 2014 Accommodation Request; Sabin Dep. 107.) Dr. Keller stated in the Accommodation Request that Plaintiff "has severe depression which makes her sleep impaired and makes it difficult to get up in the a.m." (Jan. 2014 Accommodation Request.) Dr. Keller requested that Plaintiff be provided "flexible work hours." (*Id.*) With Plaintiff's permission, Sabin contacted Dr. Keller to gain clarity on the accommodation request because he felt that "flexible work hours" was vague. (Sabin Dep. 109.) At the time that Plaintiff submitted the Accommodation Request, her start time was 9:30 a.m. (*Id.* at 108.) Sabin testified that Dr. Keller was surprised to learn that Plaintiff had already had a 9:30 start time, and that Dr. Keller believed that a 9:30 start time was a reasonable accommodation. (*Id.* at 111-12.) Vanguard

believed that Plaintiff's request for an accommodation was granted because she already had been permitted a 9:30 start time, even though core business hours begin at 8 a.m.  (Chigullapalli Dep. 55; Sabin Dep. 95.)

> 7.    *Request for Family Medical Leave Act ("FMLA") Leave*

Plaintiff continued to meet with Chigullapalli weekly throughout February to discuss progress on closing the performance gaps in the Written Alert.  After Plaintiff complained that she believed Chigullapalli scheduled their meetings on Fridays intentionally "to ruin her weekends," Sabin requested that Chigullapalli move the meetings to Monday, and he did.  (Crew Relations Session 71536.)  On February 12, 2014, Plaintiff called out of work because she was not feeling well.  (Crew Relations Session 71535, Pl.'s Resp. Ex. FF.)  In her e-mail to Chigullapalli and Sabin, she stated, "[j]ust because you scold me, it doesn't make my medical conditions go away."  (*Id*.)  Sabin responded to the e-mail, "I'm sorry you are not feeling well. As we discussed when we met on January 31, 2014, you may apply for intermittent FMLA if you feel that you have a medical condition that limits your ability to come to work."  (*Id*.)  Sabin provided her with contact information for applying for intermittent FMLA.  (*Id.*)

On March 5, 2014, Plaintiff met with Chigullapalli and Sabin.  Plaintiff had just returned from a planned vacation on February 22 through February 28, 2014.  (Crew Relations Session 71979, Defs.' Ex. CC.)  Chigullapalli provided feedback on her performance under the Written Alert.  (*Id*.)  After the meeting, Sabin noted that Plaintiff "argued each point and said his facts were not accurate."  (*Id*.)  Sabin also noted that Plaintiff made inappropriate comments during the meetings, such as:  "Talking to you is like talking to the wall"; "I didn't ask for approval to work from home because I don't want to talk to you"; "I don't want to talk to you now"; "I'm

not your slave"; "Why does it matter if I turn my status reports on Tuesday instead of Friday?"; and "You gave me a ridiculous timeframe for the project – you are setting me up to fail."  (*Id.*)

The day after the meeting, Chigullapalli e-mailed Plaintiff to summarize their conversations.  (Crew Relations Session 71978, Pl.'s Resp. Ex. GG.)  He highlighted one project where Plaintiff had made progress, but also noted that Plaintiff still needs to improve in availability during core hours, sending weekly updates, and communicating availability with everybody on the team.  He provided examples of areas where Plaintiff failed to report time off, request to work from home, or failed to submit a status report.  (*Id.*)  In a response e-mail, Plaintiff disputed all of the concerns raised by her supervisor.  (*Id.*)  Plaintiff also stated "my illness and the requests my doctor had made have also been ignored."  (*Id.*)  Sabin responded to Plaintiff's e-mail with words of encouragement:

> Jennifer, I'm sorry you are upset.  I will schedule a meeting for us next week.  I recommend discussing this with your doctor.  Vanguard has benefits to support crew.  If you and your doctor feel a medical leave would help you let me know how I can help.  We discussed FMLA and [short term disability] and I thought I helped you understand the process.  Let me know how I can help.  As [Chigullapalli] stated yesterday, him providing performance feedback is to help you be successful and is his responsibility.  Thanks.

(*Id.*)  The next day, Plaintiff responded to Sabin's e-mail, stating that "[t]here is a clear difference between providing feedback for improvement and distorting events in order to create a paper trail for the outcome you desire."  (Crew Relations Session 71084, Pl.'s Resp. Ex. HH.)  Plaintiff further stated that "[w]eek after week any progress I have made towards 'closing performance gaps' has been completely ignored because any success I have does not support the agenda [to terminate me]."  (*Id.*)

On March 12, 2014, Chigullapalli contacted Sabin to provide him an "assessment of the impact of [Plaintiff's] lack of engagement with the design and project teams."  (Crew Relations

15

Session 72101, Pl.'s Resp. Ex. II.)  Chigullapalli explained that Plaintiff does not communicate

with her team, and does not take time to understand the goals of her assignments.  (*Id.*)  He

provided two examples where Plaintiff failed to communicate with the team until the end of the

deadline for the project, at which time it was too late to incorporate changes and feedback.

Chigullapalli also advised that Plaintiff continues to not provide correct and timely updates on

her availability, and fails to submit status reports and PTO requests.  (*Id.*)   He provided

examples for these performance gaps, including that Plaintiff was out of the office for an entire

week without letting her team know, and continues to arrive to work past the agreed-upon time

of 9:30 a.m. "on most occasions."  (*Id.*)

On March 12, 2013, Plaintiff met with Sabin and Sharron Patton, another HR

representative, to discuss FMLA and short term disability.  (Crew Relations Session 72099, Pl.'s

Resp. Ex. JJ.)  During the meeting, Plaintiff stated that Vanguard has discriminated against her

due to her illness.  (*Id.*)  Plaintiff explained that she believed her health issues were ignored, and

that ever since she made Vanguard aware of her disabilities, she has had things taken away, such

as assignments, work flexibility, and her work-from-home privileges.  (*Id.*)  Later that day,

Plaintiff requested, and was granted, FMLA leave.  She took just under the six months of

maximum time permitted under the FMLA.  (Crew Relations Session 72017, Defs.' Mem. Ex.

FF.)

### 8.    *Plaintiff's Return from FMLA Leave and Subsequent Termination*

Plaintiff returned from FMLA leave on June 2, 2014.  (Brown Dep. 318.)  Upon

returning, she presented Vanguard with a Return to Work Certificate, which was signed by Dr.

Keller.  (Return to Work Cert., Pl.'s Resp. Ex. MM.)  The Certificate indicated that Plaintiff

could return to work with restrictions.  (*Id.*)  Specifically, Dr. Keller requested that Plaintiff be

granted a "[f]lexible work schedule allowing [her] to work from home some mornings each week as necessary due to her medical issues."  (*Id*.)  Vanguard agreed to the restriction that Plaintiff could work from home "a couple of hours during the morning a couple of days each week," so long as Plaintiff let people know, and that she was available on all Vanguard channels.  (Crew Relations Session 73759, Defs.' Mem. Ex. M.)  Plaintiff testified that she believed that this accommodation was consistent with Dr. Keller's Return to Work Certificate.  (Brown Dep. 320.)  She also testified that the accommodation "certainly helped with the depression issues and . . . symptoms."  (*Id*. at 324.)

When Plaintiff returned from FMLA leave, she had approximately one week left on her sixty-day written alert.  (*Id*. at 321.)  Sabin recommended that the written alert be reinstated for another sixty days so that Plaintiff had additional time to improve on her performance. (Chigullapalli Dep. 39-40.)  Plaintiff did not want to reset the sixty-day time period.  (*Id*. at 40; Brown Dep. 321.)  As a compromise, Plaintiff was given approximately three to four weeks after returning from FMLA leave to demonstrate improvement.  (Chigullapalli Dep. 40, 43)  During this time, Plaintiff was provided weekly evaluations and performance expectations. (Chigullapalli Dep. 41.)

Plaintiff believed that her work was excellent when she returned from FMLA leave. (Brown Dep. 324.)  Chigullapalli did not agree.  Plaintiff was evaluated at the end of the two-to-three week period remaining on the Written Alert.  Chigullapalli stated that her performance remained "significantly below par."  (Chigullapalli 40.)  On June 13, 2014, Chigullapalli and his supervisor, Cook, called Sabin to advise him that since returning from leave, Plaintiff had only been in the office approximately three to four hours per day and had not completed any of the

tasks assigned to her.  (Crew Relations Session 73924, Pl.'s Resp. Ex. OO.)  Plaintiff also

skipped a meeting.  (*Id.*)

      On June 17, 2014, Plaintiff was issued a Formal Warning for "deficient performance."

(Formal Warning, Pl.'s Resp. Ex. PP; Brown Dep. 327.)  Plaintiff was advised that if she did not

improve her performance, she could be terminated.  (Brown Dep. 327.)   The Formal Warning

stated, among other things, that Plaintiff "has continued to struggle to understand the roles and

responsibilities of her assignments."  (Formal Warning.)  Numerous examples were provided to

support her deficiency in this category, such as failing to seek feedback on assignments from

team members in a timely manner, and unnecessarily spending time on a design icon that failed

to meet brand standards.  (*Id.*)  The Formal Warning also stated that Plaintiff missed submitting

weekly status reports in a timely matter, has been frequently late to work and to team meetings,

and continues to be unavailable on all avenues when working from home.  (*Id.*)  Plaintiff refused

to sign the Formal Warning.  (*Id.*)   On June 23, 2017, Chigullapalli sent Plaintiff an e-mail

which provided a detailed outline of his expectations of her in the next two weeks.  (Crew

Relations Session 74846, Defs.' Mem. Ex. O.)

      On June 27, 2014, Plaintiff was provided a Midyear Update.  (2013 Midyear Update,

Pl.'s Resp. Ex. QQ.)  She was rated as "proficient" in the area of technical or subject matter

expertise, but rated as "further development needed" in all other categories.  (*Id.*)  Similar to the

statements made in the Formal Warning, the Midyear Update noted that Plaintiff fails to provide

feedback to other team members, is not open to receiving feedback, has not demonstrated an

ability to influence design decisions, has "struggled to build strategic and working relationships,"

and lacks an understanding about the short and long term goals of the business.  (*Id.*)  It was

specifically noted that although Plaintiff "was able to turn around the required deliverables in

time, her lack of understanding of the design standards or the best practices followed by the team meant that the quality of the work was not good." (*Id*.)

On July 2, 2014, Plaintiff met with Lisa McCann, who is the direct supervisor of Cook, to discuss her midyear review. (Crew Relations Session 74838, Pl.'s Resp. Ex. RR.) After the meeting, Plaintiff sent e-mails to McCann to share what she believed to be performance achievements, despite her midyear review. (*Id*.) She complained to McCann that her evaluations had always been good until she reported her medical issues to her supervisor. (*Id*.)

Not seeing any improvement after multiple periods of reviews and multiple mentoring sessions and coaching, Chigullapalli discussed terminating Plaintiff with his leadership team. (Chigullapalli Dep. 34; Cook Dep. 26.) Chigullapalli testified that he tried to help Plaintiff be as successful as she could be, and provided her with the accommodations she requested, while still holding her to performance standards. (Chigullapalli Dep. 35.) The decision to terminate Plaintiff was made by Chigullapalli and his leadership team, which included Cook and McCann. (Cook Dep. 25-26.) Cook believed that Chigullapalli "took every action necessary to help [Plaintiff], coaching her through the performance deficiencies" and that her failure to improve was "certainly not a lack of effort on [Chigullapalli's] part." (*Id*. at 45.) Cook further testified that "it got to a point that, despite our best efforts [to help Plaintiff], there was not going to be a willingness on the other side to close those gaps. We did not see results that we needed to see for the expectations of that job." (*Id*. at 46.)

On August 1, 2014, Plaintiff was terminated from her position at Vanguard. (Crew Relations Session 74955, Pl.'s Resp. Ex. TT.) On January 28, 2015, Plaintiff dual-filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"). (Compl. ¶ 5.)

### B.      Procedural History

On February 29, 2016, Plaintiff filed a Complaint in this Court.  (Compl., ECF No. 1.)
The Complaint contains three counts:  (1) discrimination, harassment, retaliation, and failure to
accommodate under the ADA, asserted against Vanguard (Count I); (2) discrimination,
harassment, retaliation, and failure to accommodate under the PHRA, asserted against Vanguard
and Chigullapalli (Count II); and retaliation under the FMLA, asserted against Vanguard (Count
III).

On September 9, 2016, Defendants filed a Motion for Summary Judgment.  (Defs.' Mot.,
ECF No. 10.)  On September 30, 2016, Plaintiff filed a Response in Opposition to Defendants'
Motion.  (Pl.'s Resp., ECF No. 11.)  Trial is scheduled to commence on February 6, 2017.

## II.      LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant
shows that there is no genuine dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on
which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cnty. of
Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
248 (1986)).  "[A] factual dispute is material only if it might affect the outcome of the suit under
governing law."  *Id.*  The court must view the evidence in the light most favorable to the non-
moving party.  *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).  However, "unsupported
assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for
summary judgment.  *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D.
Pa. 2010) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)).

Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co*., 391 F.3d 497, 502 (3d Cir. 2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."); *see also Matsushita Elec. Indus. Co.*, *v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## III.   DISCUSSION

Plaintiff asserts claims for discrimination, harassment, retaliation, and failure to accommodate under the ADA (Count I) and under the PHRA (Count II). Plaintiff also asserts a claim for retaliation under the FMLA (Count III). Defendants seek summary judgment with respect to all claims asserted by Plaintiff. Defendants contend that even when viewing the facts in the light most favorable to Plaintiff, no reasonable factfinder could conclude that Vanguard's discipline and ultimate termination of Plaintiff was retaliatory or was in any way based on discriminatory animus.

### A.    Disability Discrimination Claim Under ADA and PHRA[9]

Defendants argue that summary judgment is appropriate because Plaintiff's termination was based on a history of poor performance, and not because of her disabilities.  Plaintiff responds that complaints about her performance and reprimand were made in response to her notifying Vanguard about her disabilities.  Plaintiff contends that this raises an inference that the reprimand and subsequent termination were motivated by unlawful discriminatory intent.

Under the ADA, employers are prohibited from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  A plaintiff asserting an ADA claim proceeds using the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973).  *See Walton v. Mental Health Ass'n of Se. Penn.*, 168 F.3d 661, 667-68 (3d Cir. 1999) (applying the *McDonnell Douglas* burden shifting rules to ADA claims).  Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  If a plaintiff successfully establishes a prima facie case, the burden then shifts to the defendant to articulate some legitimate non-discriminatory reason for its employment decision.  *Id*.  If the defendant succeeds, the burden then shifts back to the plaintiff to show that the employer's stated reason for the employment action was merely a pretext for intentional discrimination.  *Id*. at 804.

---

[9] The legal standards and analysis applicable to ADA claims is substantively identical to discrimination claims under the PHRA.  *See Rinehimer v. Cemcolift, Inc*., 292 F.3d 375, 382 (3d Cir. 2002) (noting that the statutes are interpreted in accord with one another, and "[t]herefore, our disposition of [the plaintiff's] ADA claim applies with equal force to his PHRA claim."); *Kelly v. Drexel Univ*., 94 F.3d 102, 105-06 (3d Cir. 1996).  The parties combined their arguments in their briefing and do not dispute that the standards are the same.  We will therefore address Plaintiff's ADA and PHRA claims collectively.

1.     *Prima Facie Case*

To establish a prima facie case of discrimination under the ADA, "a plaintiff must show (1) that [s]he is disabled within the meaning of the ADA, (2) that [s]he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that [s]he was subjected to an adverse employment decision as a result of the discrimination." *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010). Defendants do not dispute that Plaintiff has established the first and second elements in that she is disabled within the meaning of the ADA, and that she is qualified for her position, with or without reasonable accommodations. Our focus is on the third element of Plaintiff's prima facie case.[10]

---

[10] We note, however, that Plaintiff's claim that she was disabled by depression is open to serious question, based upon the evidence in the record. A "disability" under the ADA may be found in one of three ways. A plaintiff is disabled if she shows: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Disabilities that are caused solely by work-related stress or strained relationships with supervisors often do not meet the standard of disability under the ADA. *See, e.g.*, *Maslanka v. Johnson & Johnson, Inc.*, 305 F. App'x 848, 852 (3d Cir. 2008) (affirming district court's finding that the plaintiff was not disabled where his "anxiety and depression was expected to last only so long as Fronius remained his supervisor or continued to give him bad evaluations."); *Anderson v. Radio One, Inc.*, No. 09-194, 2010 U.S. Dist. LEXIS 99713, at *25 (E.D. Pa. Sept. 20, 2010) (noting that "[c]ognitive limitations that lack long term impact and that stem from poor evaluations from a supervisor do not exhibit the severity, permanence, and longevity necessary to establish a substantial impairment"). The record in this case is replete with admissions by Plaintiff that her depression was caused by work-related stress, and in particular, by the strained relationship that she had with her supervisor, Chigullapalli. For example, in a letter Plaintiff wrote notifying her employer she was taking FMLA leave, she stated that her "job and work environment have been causing [her] to have severe depression, social anxiety, insomnia, physical pain, along with other symptoms that coincide with depression." (Crew Relations Session 72069, Pl.'s Resp. Ex. KK.) In that same letter, she stated that her supervisor— Chigullapalli—is the "cause of these problems." (*Id.*) Plaintiff made numerous statements during her deposition that her issues were caused by work-related issues. (*See, e.g.*, Brown Dep. 315 ("I took [FMLA] leave because the situation with [Chigullapalli] was untenable."); *id.* (noting that the fact that her performance was being reported incorrectly was "causing a tremendous amount of depression").)

23

Defendants argue that the record contains no evidence supporting an inference that Plaintiff was terminated because of her disabilities.  They argue that the record shows the opposite:  that "Vanguard responded positively, generously, and compassionately to the notice of [Plaintiff's] disabilities, her requests for accommodation and leave, and her performance deficiencies."  (Defs.' Mem. 36.)  Plaintiff responds that the evidence supports a discrimination claim because "almost immediately following [her] informing her supervisors of her disability and requesting accommodations, she received counseling, negative reviews and discipline."  (Pl.'s Resp. 34.)[11]

Plaintiff has presented no direct evidence of discriminatory bias.  She concedes that no supervisor, HR representative, or member of senior management ever said anything derogatory to her about her disability.  Plaintiff instead relies on circumstantial evidence, and in particular, the timing of her notifying Vanguard about her disabilities and the subsequent discipline and negative performance evaluations to make out her case.  Specifically, Plaintiff points to the following circumstantial evidence:  (1) she received an overall rating of "further development needed" from Morelli in her 2012 year-end performance evaluation, which occurred after she had disclosed to Morelli that she suffered from depression; (2) she was placed on a performance improvement plan on October 31, 2013, which was just two weeks after disclosing that she

---

[11] The discrimination claim is based on Vanguard's termination of Plaintiff.  Although it is not entirely clear from her Response, to the extent that Plaintiff bases her discrimination claims on Vanguard's discipline, such claims would fail.  An adverse employment action is "an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004).  Vanguard's decisions to issue discipline, negative performance evaluations, or written warnings do not constitute adverse employment actions.  *See Tucker v. Merck & Co.*, 131 F. App'x 852, 857 (3d Cir. 2005) ("A negative evaluation, by itself, is not an adverse employment action.");  *Reynolds v. Dep't of the Army*, 439 F. App'x 150, 153 (3d Cir. 2011) (holding that a performance improvement plan "is not an adverse employment action absent accompanying changes to pay, benefits, or employment status").  Plaintiff has not shown that any of the disciplinary actions she received altered the terms or conditions of her employment.

suffers from depression in her Open Channel Message; (3) her work-from-home privileges were revoked weeks after disclosing her disability, despite the fact that "every other employee on [her] team" had the ability to work from home; (4) her flexible hours were changed, requiring her to report to work at 9:30 a.m., just weeks after reporting her depression; and (5) she received a negative performance evaluation from Chigullapalli in her 2013 Appraisal, just weeks after disclosing that she had suffered a panic attack.  (Pl.'s Resp. 34-35.)

A review of the evidence does not support Plaintiff's position.  The record reflects that Morelli switched departments in March 2013, and took no part in the decision to terminate Plaintiff.  Therefore, Morelli's negative performance evaluation of Plaintiff in late 2012 in no way raises an inference of discrimination as to Vanguard's decision to terminate Plaintiff.  In addition, there is no evidence in the record that Plaintiff was placed on a "performance improvement plan" in October 2013.  In response to Plaintiff's Open Channel Message, Human Resources conducted an extensive investigation into Plaintiff's allegations that she felt "bullied" and "harassed" at work.  During the course of that investigation, Human Resources learned the extent of Plaintiff's performance issues, not just from her current and former supervisors, but also from her co-workers.  To help Plaintiff moving forward, Chigullapalli set out clear performance expectations, and offered to make himself available and assist in any way he could.  Also in response to the Open Channel Message, Vanguard repeatedly offered Plaintiff support, encouraged her to take advantage of Vanguard's counseling services, and informed her about her options to take FMLA or short term disability leave.

The revocation of Plaintiff's work-from-home privileges and the change in her flexible work schedule just weeks after disclosing her disabilities also do not establish an inference of discrimination.  Those changes directly correlate with complaints made by supervisors and co-

25

workers about her availability and lack of communication.  There can be no dispute that Plaintiff's general availability during core working hours had been a concern of her supervisors since early on in her employment at Vanguard.  These concerns arose long before Vanguard was notified about Plaintiff's disabilities.  Morelli noted that Plaintiff had attendance issues, which happened consistently since the beginning of 2012.  Chigullapalli shared Morelli's concerns about Plaintiff's availability and attendance, and expressed his concerns to Plaintiff during meetings and in formal evaluations prior to being made aware of Plaintiff's disabilities. Chigullapalli did not learn about Plaintiff's depression until October 2013.  However, in Plaintiff's June 2013 Midyear Update, Plaintiff received several "developmental areas," which included availability and communication of availability to stakeholders.  In June, Chigullapalli instructed Plaintiff to not work from home until she gained access to the necessary remote access.  Nevertheless, Plaintiff continued to work from home a couple days per week without those tools despite her supervisor's instructions.  The IT activity report corroborates Chigullapalli's concerns, and shows that Plaintiff was neither productive nor available when she worked from home.

Finally, the fact that Plaintiff received a negative evaluation in her 2013 Appraisal just weeks after disclosing to Chigullapalli that she suffered a panic attack does not support her prima facie case.  Many of the performance gaps noted in the 2013 Appraisal were carried over from the Midyear Update.  Taken together, all of this evidence fails to show that Plaintiff's disabilities were a "determinative factor" in Vanguard's decision to terminate her.  *Decker v. Alliant Techs., LLC*, 871 F. Supp. 2d 413, 428 (E.D. Pa. 2012) (citing *Watson v. SEPTA*, 207 F.3d 207, 214-15 (3d Cir. 2000)).  Accordingly, we are compelled to conclude that Plaintiff has failed to establish a prima facie case of discrimination by Vanguard on the basis of a disability.  Notwithstanding

Plaintiff's failure to establish a prima facie case, we will assume for the purpose of argument that a prima facie case was established and will consider her claims under the balance of the *McDonnell Douglas* framework.

> 2.   *Legitimate Non-Discriminatory Reason for Adverse Employment Action and Pretext*

Defendants have articulated a legitimate non-discriminatory reason for terminating Plaintiff's employment with Vanguard.  As stated above, Defendants contend that Plaintiff's termination was the result of Plaintiff's consistent and notable performance deficiencies during the course of her employment.  The multiple negative performance evaluations—at least one of which was issued prior to her supervisor even knowing about her disability—and the multiple meetings and e-mails where these performance deficiencies were explained in detail, support this proffered reason.  The burden shifts back to Plaintiff to establish that Defendants' stated reason is merely a pretext for discrimination.

In order to establish pretext, Plaintiff must point to evidence that:  1) "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication"; or that 2) permits the factfinder to reasonably conclude "that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994).  With respect to the first way to show pretext, a plaintiff

> cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . .

*Id.* at 765 (internal quotation marks and citations omitted).  "'[F]ederal courts are not arbitral boards ruling on the strength of 'cause' for discharge.  The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination].'"  *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (quoting *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996)); *see also Coulton v. Univ. of Pa.*, 237 F. App'x 741, 747 (3d Cir. 2007).

In her Response, Plaintiff does not offer any arguments that Defendants' proffered reason was merely pretext for discrimination.  Instead, she incorporates the pretext arguments that she made in defense of her retaliation claims.  In her retaliation claims, Plaintiff points to two categories of circumstantial evidence to establish pretext:  evidence of unusually suggestive timing, and evidence of antagonism.  The types of evidence that support a showing of pretext for retaliation claims differs from the evidence used to support pretext for discrimination claims.  For example, with respect to retaliation claims, evidence of unusually suggestive timing measures the temporal proximity between the protected activity and the retaliatory action.  *See Blakney v. City of Philadelphia*, 559 F. App'x 183, 186 (3d Cir. 2014).  In contrast, evidence of timing in discrimination claims is measured from the disclosure of the disability and the adverse employment action—here, termination.  *See Walton*, 168 F.3d at 669.  Plaintiff has failed to point to relevant evidence or make any substantive arguments to demonstrate pretext in relation to her discrimination claims.   We will nevertheless view the record as a whole to determine if pretext exists.  As set forth below, when viewing the record in the light most favorable to Plaintiff, the evidence does not show any weaknesses, implausibilities, or inconsistencies in Vanguard's reasons for terminating her.

In evaluating whether Vanguard's decision to terminate Plaintiff was pretext for discrimination, we may consider the temporal proximity between when Plaintiff disclosed her disabilities to Vanguard and when she was terminated.  *Walton*, 168 F.3d at 669.  However, there must be "some logical connection between the timing . . . and the possibility of the particular discrimination at issue."  *Id*.  Here, Plaintiff maintains that she disclosed her depression to Morelli in the first few months of her employment at Vanguard.  Therefore, Morelli became aware of Plaintiff's disability, at the latest, in December 2011 or January 2012.  Chigullapalli first became aware of Plaintiff's disabilities in October 2013.  Plaintiff was terminated on August 1, 2014.  The relative timeframe between disclosure and termination was two-and-a-half years with respect to Morelli, and just under ten months with respect to Chigullapalli.  Without more, these time frames do not show a logical connection between Plaintiff's disability and her termination.

Nor does evidence of a pattern of antagonism establish an inference of discrimination.  Plaintiff asserts that the "constant barrage of written and verbal warnings, close observations, refusals to accommodate, etc., are severe and are alone sufficient to show pretext."  However, the evidence shows that the very criticisms about her performance that ultimately led to her termination were the same criticisms that she had received throughout the tenure of her employment at Vanguard.  More importantly, these same criticisms arose prior to Vanguard being put on notice of her disabilities.  The evidence shows that Plaintiff failed to sufficiently make herself available to, communicate with, incorporate comments from, and produce timely work product to her supervisors, her clients, and her teammates.  Despite numerous attempts by multiple Vanguard employees to offer constructive feedback and specific measures to improve, Plaintiff never held herself accountable.  Instead, Plaintiff denied that she had any performance

gaps.  She believed that she was an excellent designer that produced high quality work.

However, Plaintiff's focus on one aspect of her performance—an aspect that was not the basis of

Vanguard's decision to terminate—is not relevant to analyzing pretext.  *See Steward v. Sears,*

*Roebuck & Co.*, 231 F. App'x 201, 210 (3d Cir. 2007) ("A plaintiff does not establish pretext by

pointing to commendation[s] . . . in categories the defendant says it did not rely upon in making

the employment decision at issue.").  Instead, we must consider Plaintiff's "performance in the

categories that [Vanguard] deemed relevant to the employment decision" to terminate her.  *Id.*

(citation omitted).  In this regard, the record shows that Plaintiff's termination was based not on

whether she was a skilled and capable designer—a fact that Vanguard does not dispute—but

rather on the fact that she was chronically late to work; that she was unavailable on all channels

when she worked from home; that she worked from home without prior authorization; that she

missed project meetings, project deadlines, and status reports; and that she did not welcome and

incorporate feedback from teammates.

Plaintiff argues that her negative evaluations and discipline was merely Vanguard's

attempt to create a "fake paper trial" of performance issues to substantiate its discriminatory

motive.  This argument is not persuasive for a number of reasons.  First, Plaintiff points to no

facts to refute Vanguard's evidence of performance gaps.  She simply states that Chigullapalli

lied about them and that he was on a mission to see her fail.  Plaintiff's bald statements are

insufficient to establish pretext.  *See Grove v. Admiral Peary Area Vocational-Technical Sch.*,

221 F. App'x 101, 104 n.2 (3d Cir. 2007) (affirming grant of summary judgment where the

plaintiff's proof that demotion was pretext for discrimination "consist[ed] solely of self-serving

speculation"); *Cooper v. PricewaterhouseCoopers*, No. 07-1399, 2008 U.S. Dist. LEXIS 76041,

at *12 (E.D. Pa. Sept. 30, 2008) ("Plaintiff's beliefs, without more, are insufficient to support a claim of pretext.").

Next, Plaintiff's "fake paper trail" argument ignores the fact that Plaintiff's performance issues arose months prior to Chigullapalli first learning about her disability in October 2013. "Where there is a documented history of performance issues in an employee's job history prior to disclosure of an impairment, courts have hesitated to find a discriminatory motive in subsequent terminations." *Anderson*, 2010 U.S. Dist. LEXIS 99713, at *32 (rejecting the plaintiff's claim that her termination, which took place three weeks after disclosing her disability, raised an inference of discrimination because performance concerns were raised prior to the disclosure of disability). Chigullapalli began noticing performance gaps as early as May 2013 when managers on the United Way Project complained to him that Plaintiff did not timely produce design deliverables, was not open to feedback on her performance designs, and failed to attend project meetings. Chigullapalli shared these concerns with Plaintiff. In addition, during Plaintiff's Midyear Update in June 2013, performance issues were again shared with Plaintiff. Plaintiff was put on notice that she needed to improve her communication with clients and teammates with regard to her whereabouts and the status of her projects. Plaintiff also continued to work from home despite being told that she should not do so without the tools to permit complete remote access. Evidence showing that performance issues arose prior to Vanguard's knowledge of Plaintiff's disabilities undercuts a finding that her termination was a pretext for discrimination. *See Shaner v. Synthes (USA)*, 204 F.3d 494, 504 (3d Cir. 2000) (rejecting argument that termination was motivated by discriminatory intent where the plaintiff's performance evaluations "contained similar criticisms both before and after he made the company aware that he suffered" from a disability).

31

Plaintiff has also failed to set forth evidence under the second approach to establishing pretext. Under this approach, Plaintiff must point to evidence "with sufficient probative force" that permits the factfinder to reasonably conclude that discrimination was "more likely than not a motivating or determinative cause" of the adverse employment action. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 645 (3d Cir. 2015) (quoting *Fuentes*, 32 F.3d at 762, 764). Plaintiff can accomplish this by pointing to evidence showing that: (1) Defendants previously discriminated against Plaintiff; (2) Defendants discriminated against others within Plaintiff's protected class; or (3) Defendants treated similarly situated individuals more favorably. *Id.* (citing *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998)). The record contains no evidence showing that Defendants previously discriminated against Plaintiff or discriminated against other employees with disabilities. With respect to the third category, Plaintiff makes passing references to the unfair treatment she received because her co-workers were permitted flexible work schedules and work-from-home privileges, while she was not. However, there is no evidence in the record about other employees' work schedules or work-from-home privileges. More importantly, Plaintiff has pointed to no evidence showing that these individuals were similarly situated in that they had received the same performance complaints as had Plaintiff, but were nevertheless treated more favorably by having flexible work schedules and work-from-home privileges.

Even viewing the evidence in the light most favorable to Plaintiff, there is simply no evidence—either direct or circumstantial—from which a factfinder could either disbelieve Vanguard's articulated non-discriminatory reasons or conclude that discrimination because of her disability was a motivating or determinative factor in her termination. Accordingly, summary judgment will be granted with respect to Plaintiff's discrimination claims.

### B.        Failure to Accommodate Claim Under ADA and PHRA

Defendants also seek summary judgment on Plaintiff's claims that they failed to provide reasonable accommodations.  The ADA provides a remedy when an employer fails to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee," unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business."  42 U.S.C. § 12112(b)(5)(A).

Plaintiff made two requests for accommodations.  The first was in January 2014 when Dr. Keller requested that Plaintiff be given flexible work hours to help with her symptoms of depression.[12]  Plaintiff's second accommodation request was made in June 2014, after Plaintiff returned from FMLA leave.  Dr. Keller specifically requested that Plaintiff be granted a flexible work schedule allowing her to work from home some mornings each week as necessary due to her medical issues.

We only need to consider the second request for accommodation because the first request is time-barred.  Before commencing an ADA action in federal court, a plaintiff must exhaust her administrative remedies by filing a timely charge of discrimination with the EEOC.  *Churchill v. Star Enters.*, 183 F.3d 184, 190 (3d Cir. 1999).  A plaintiff exhausts administrative remedies under the ADA by filing a charge with the EEOC within 300 days of the alleged discriminatory action.  *Mercer v. Se. Pa. Transit Auth.*, 26 F. Supp. 3d 432, 440-41 (E.D. Pa. 2014).  A plaintiff exhausts administrative remedies under the PHRA by filing a charge with the PHRC within 180 days of the alleged discriminatory action.  43 Pa. Stat. Ann. § 959(h).  Here, Plaintiff dual-filed a charge of discrimination with the EEOC and the PHRC on January 28, 2015.  Accordingly, any

---

[12] Dr. Keller indicated that Plaintiff's 9:30 a.m. start time was a reasonable accommodation.

discrete acts of discrimination that occurred more than 300 days prior to this date, or before April 3, 2014, are time-barred under the ADA.  Any discrete acts of discrimination that occurred more than 180 days prior to January 28, 2015, or before August 1, 2014, are time-barred under the PHRA.  Plaintiff's first request for accommodation is therefore time-barred under both the ADA and the PHRA.  Plaintiff's second request for accommodation is time-barred under the PHRA. Plaintiff does not dispute that she failed to exhaust administrative remedies with respect to her first accommodation.[13]  Therefore, we will limit our analysis to Plaintiff's second request for a reasonable accommodation under the ADA.

Defendants argue that summary judgment is appropriate because Plaintiff's second request for a reasonable accommodation was granted.  Plaintiff responds that despite being granted this accommodation, the claim should nevertheless survive because she was disciplined for working from home within the guidelines of her accommodation.  Plaintiff fails to point to any evidence in the record to support this argument.  Instead, the evidence shows that Plaintiff was granted the accommodation, and that she was permitted to work from home a couple hours in the morning a couple of days per week, so long as she was available on all Vanguard channels while she worked from home.  Plaintiff conceded that the accommodation granted by Vanguard helped with her symptoms of depression and was consistent with Dr. Keller's Return to Work

---

[13] Plaintiff requests that we consider the evidence related to her first request for an accommodation when analyzing whether the second request for an accommodation was in violation of the ADA.  Evidence surrounding her first accommodation request is not relevant to determining whether Vanguard reasonably accommodated her second request.  "An employer's denial of a request for a reasonable accommodation is a discrete act of discrimination that is an independently actionable unlawful employment practice under the ADA."  *Mercer v. Se. Pa. Transit Auth.*, 26 F. Supp. 3d 432, 442 (E.D. Pa. 2014) (citations omitted).  Even if evidence about the first request for an accommodation was relevant, it would not support Plaintiff's claim. Based upon a review of all of the evidence, it is apparent that Vanguard actually granted Plaintiff's first request for an accommodation and provided her flexible work hours consistent with Dr. Keller's request.

Certificate.  Plaintiff was not disciplined or criticized for taking advantage of the reasonable accommodation.  She was, however, disciplined for working from home beyond the hours permitted, and for other reasons.  Just two weeks after being granted the accommodation, her supervisor complained that she had only been in the office three to four hours per day, had not yet completed any of the tasks assigned to her, and had skipped a meeting.  When she did work from home, she was not available on all Vanguard channels.  Based upon this evidence, we are satisfied that Vanguard provided Plaintiff's accommodation request.  Accordingly, summary judgment will be granted with respect to Plaintiff's claims for failure to accommodate.

### C.    Retaliation Claim Under ADA, PHRA, and FMLA[14]

Plaintiff contends that Defendants retaliated against her by subjecting her to unfair criticism and discipline and ultimately terminating her after she engaged in various protected activities.  Defendants seek summary judgment on the retaliation claims, arguing the Plaintiff has failed to show the required causation.  The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual has made a charge . . . under [the ADA]."  42 U.S.C. § 12203(a).  Accordingly, "it is unlawful for an employer to retaliate against an employee based upon the employee's opposition to anything that is unlawful under the ADA."  *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188 (3d Cir. 2003).  Requesting an accommodation is a protected activity for purposes of the ADA's anti-retaliation provision.  *See id.* at 191.

---

[14] The standard to analyze a retaliation claim under the FMLA is the same standard used to analyze retaliation claims under the ADA.  *Ozlek v. Potter*, 259 F. App'x 417, 423 n.5 (3d Cir. 2007).  Similarly, courts use the same standards when analyzing ADA and PHRA claims.  *Salley v. Circuit City Stores, Inc.*, 160 F.3d 977, 979 n.1 (3d Cir. 1998).  Accordingly, we will analyze the claims together.

To make out a *prima facie* case of retaliation under the ADA, a plaintiff must show (1) protected employee activity, (2) adverse action by the employer either after or contemporaneous with the employee's protected activity, and (3) a causal relationship between the protected activity and the adverse action. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). The burden-shifting framework of *McDonnell Douglas* also applies to ADA retaliation claims. In all cases involving retaliation, a plaintiff must prove that retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process. *Id.* at 501. This burden always remains with the plaintiff. *Id.*

Plaintiff must first demonstrate that she engaged in a protected employment activity. "With respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')." *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) (citation omitted). To constitute a protected activity, "the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII." *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 322 (3d Cir. 2008).[15] In other words, "if no reasonable person could have believed that the underlying incident complained about constituted unlawful discrimination, then the complaint is not protected." *Id.* In addition, a complaint must be specific enough to put an employer on notice of the kind of discrimination being alleged. *Sanchez v. SunGard Availability Servs., LP*, 362 F. App'x 283, 288 (3d Cir. 2010) (citing *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)). Protected activity not only includes formal charges of discrimination,

---

[15] In the Third Circuit, precedent interpreting anti-retaliation provisions under Title VII is equally applicable to interpreting anti-retaliation provisions under the ADA. *E.E.O.C. v. Allstate Ins. Co.*, 778 F.3d 444, 449 (3d Cir. 2015) (citing *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002)).

but also "informal protests of discriminatory employment practices" and "making complaints to management." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006).

Here, Plaintiff lists thirteen instances where she believes she engaged in a protected employment activity. Specifically, she lists as protected activities: (1) her disclosure to Morelli that she suffered from depression in early 2012; (2) her complaints of bullying and unfair treatment in the Open Channel Message in October 2013; (3) her request for accommodation in January 2013; (4) her decision to take FMLA leave; (5) her subsequent request for accommodation upon returning from FMLA leave in June 2014; (6) her complaint to Cook in January 2013 that she felt she was being discriminated against; (7) her complaint to McCann in July 2014 that she felt she was being discriminated against; and (8) six verbal or written complaints of discrimination that she made to Chigullapalli or Sabin, which occurred in December 2013, and February and March 2014. (Pl.'s Resp. 19-20.)

With regard to the first alleged protected activity, there are no allegations in the Complaint that Plaintiff engaged in protected activity and was subjected to a subsequent adverse employment action during the time that Morelli was her supervisor. (*See* Compl. ¶¶ 30-37.) In any event, simply disclosing that you have a disability is not engaging in a protected activity because it is neither an act of participating in a proceeding under the ADA, nor an opposition to discrimination made unlawful by the ADA. Therefore, Plaintiff's disclosure to Morelli that she suffered from depression is not a protected activity. Plaintiff's Open Channel Message also does not constitute a protected activity. A review of the Message reveals that Plaintiff complained generally about what she believed was unfair treatment and bullying. However, she did not specifically tie that treatment to her disability. This is insufficient to constitute a protected

activity.  *See Curay-Cramer*, 450 F.3d at 135 ("A general complaint of unfair treatment is insufficient to establish protected activity under Title VII."); *Barber*, 68 F.3d at 701 (concluding that the plaintiff's letter to human resources, which complained about unfair treatment in general, and not about discrimination specifically, did not constitute a protected employment activity for the plaintiff's retaliation claim).

The remaining examples provided by Plaintiff—her request for FMLA leave, her requests for reasonable accommodations, and her complaints to management and HR about discrimination—constitute protected activities for purpose of her retaliation claims.  *See Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009) (holding that a request for FMLA leave may constitute a protected activity); *Shellenberger*, 218 F.3d at 191 (holding that a request for a reasonable accommodation constitutes a protected activity); *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (observing that protected activity includes "informal protests of discriminatory employment practices, including making complaints to management") (citation omitted).

Next, Plaintiff must prove that that she suffered an adverse employment action.  To constitute an adverse employment action, Plaintiff must show that a reasonable employee would have found that the challenged actions were "'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Moore*, 461 F.3d at 341 (quoting *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). This is an objective standard.  We must evaluate the challenged action "from the perspective of a reasonable person in plaintiff's position, considering all of the circumstances."  *Burlington*, 548 U.S. at 68.

Plaintiff lists the following adverse employment actions to satisfy the second element of her retaliation claims:  (1) a November 6, 2013  meeting with Chigullapalli and Sabin to discuss performance deficiencies and expectations;[16] (2) the revocation of her work-from-home privileges in January 2014;[17] (3) the January 13, 2014 Written Warning; (4) her January 30, 2014 meeting with Sabin, where he "scolded" her and threatened further disciplinary action for confronting co-workers about their feedback of her to Chigullapalli; (5) the June 17, 2014 Formal Warning, which was issued fifteen days after returning from FMLA leave; (6) the June 27, 2014 Midyear Update, which was issued less than four weeks after return from FMLA leave; and (7) her termination on August 1, 2014.[18]

Finally, Plaintiff must demonstrate a causal connection between the protected activity and the adverse action.  "A causal connection may be established by showing an unusually suggestive temporal proximity between the protected conduct and the adverse action or a pattern of antagonism coupled with timing."  *Emmett v. Kwik Lok Corp.*, 528 F. App'x 257, 262 (3d Cir.

___

[16] Plaintiff contends that the meeting took place on October 31, 2013.  The evidence does not support this.  The meeting on October 31 was with Sabin only.  The meeting on November 6 was with both Sabin and Chigullapalli.

[17] Plaintiff again mischaracterizes the evidence in the record.  The evidence shows that Plaintiff's work-from-home privileges were revoked in January 2014, not in November 2013.

[18] Plaintiff also lists other employment actions that do not qualify as adverse employment actions for purposes of her retaliation claims.  For example, Morelli's rating of "further development needed" in the 2012 year-end Appraisal was not an adverse employment action because Plaintiff had not yet complained about any discriminatory treatment.  Chigullapalli's decision to document Plaintiff's weekly performance feedback is not materially adverse; it was simply an attempt by her supervisor to provide clear guidance for her improvement.  Chigullapalli's March 12, 2014 message to Sabin, notifying him of Plaintiff's performance deficiencies was similarly not materially adverse because Plaintiff was not aware that it was sent, and thus it could not have dissuaded a reasonable worker from making a claim of discrimination.  Finally, Sabin's suggestion to reset the sixty-day period on Plaintiff's written alert when she returned from FMLA leave was not an adverse employment action because the period was never reset.

2013) (citation omitted).  Plaintiff argues that causal connection is shown both by the temporal proximity between the protected activity and the adverse employment action, and by a pattern of antagonism from Vanguard that came in the form of discipline, negative evaluations, and warnings.

With respect to the timing, "temporal proximity between the employee's protected activity and the alleged retaliatory action may satisfy the causal link element of a prima facie retaliation claim, at least where the timing is unusually suggestive of retaliatory motive." *Verma v. Univ. of Pa.*, 533 F. App'x 115, 119 (3d Cir. 2013) (citation omitted).  Here, Plaintiff contends that the timing is suspicious due to the short intervals between pairings of protected activities and adverse actions.  It is true that some of the examples of adverse actions come within weeks of the protected activity.  However, Plaintiff ignores a critical flaw in this argument.  All of the adverse employment actions involve discipline for poor performance that began long before Plaintiff first engaged in a protected activity.  The Third Circuit has "declined to infer such a causal link where the employee's negative performance evaluations pre-dated any protected activity." *Verma*, 533 F. App'x at 119.

Plaintiff's first protected activity occurred on December 2013 when she complained to Sabin that she believed Chigullapalli was attempting to have her fired, and that he showed no concern for her disabilities.  However, Plaintiff's long documented history of performance deficiencies began as early as December 2012, when she received a "further development needed" from Morelli on her year-end Appraisal.  Morelli had complained about Plaintiff's attendance issues, and that Plaintiff was not producing timely design concepts, arriving late to work, and failing to communicate her whereabouts to her teammates.  These concerns continued throughout 2013, and through the transition to a new supervisor.  Plaintiff's performance issues

persisted under Chigullapalli.  In June 2013, Chigullapalli received complaints from project managers that Plaintiff never attended project meetings, was not open to feedback on her designs, and was untimely with her designs.  In addition, Plaintiff received several "developmental areas" on Chigullapalli's June 2013 Midyear Update, which included communication, availability, and attendance.

The evidence shows that each adverse employment action alleged by Plaintiff was in response to performance issues that arose prior to Plaintiff engaging in any protected activity. The evidence also reveals that despite much effort by Vanguard, Plaintiff did not improve, and indeed, at times was defiant.  Plaintiff's long history of performance issues undermines her claim that temporal proximity reveals an inference of discrimination.  *See Verma*, 533 F. App'x at 119 (affirming dismissal of retaliation claim where the plaintiff began receiving negative evaluations prior to the protected activity); *Tahiliani v. Bayer Corp.*, 170 F. App'x 215, 217 (3d Cir. 2006) (affirming dismissal of retaliation claim due to lack of causal connection, in part, because the plaintiff's negative evaluation was based on a failure to address issues raised in prior evaluations); *Gairloch v. Pa. State Univ.*, 84 F. Supp. 3d 407, 420 (M.D. Pa. 2015) (concluding that there was no causal connection between protected activity and adverse employment action where plaintiff's performance failures and subsequent termination were based on issues "that were documented as problematic before [plaintiff] engaged in protected activities").

Where temporal proximity is not unusually suggestive, Courts consider whether viewing the evidence as a whole, including evidence of intervening antagonism, nevertheless raises an inference of discrimination.  *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007).  Plaintiff argues that a pattern of antagonism stretched over a period of years and encompassed written and verbal warnings and negative performance reviews, which all closely

followed complaints of harassment, discrimination, and retaliation.  However, Vanguard's ongoing discipline—whether expressed to Plaintiff during meetings, or in writing through performance evaluations, written warnings or formal warnings—was merely a response to performance concerns that had arisen prior to any protected activity, and prior to Vanguard even knowing that Plaintiff suffered from disabilities.  *See Lackey v. Heart of Lancaster Reg'l Med.Ctr.*, No. 16-415, 2016 U.S. Dist. LEXIS 134215, at *21-23 (E.D. Pa. Sept. 29, 2016) (granting summary judgment on retaliation claim where the ongoing antagonism was merely a response to the plaintiff's "long, ongoing history of substandard work evaluations and written warnings.").  Based upon a review of the record as a whole, we are satisfied that the evidence does not show a causal connection between Plaintiff's protected activities and the alleged adverse employment actions.  Plaintiff has failed to make out a prima facie case of retaliation. Accordingly, summary judgment will be granted on these claims.

> **D.     Harassment Claims under ADA and PHRA**

Finally, Defendants seek summary judgment on Plaintiff's harassment claims under the ADA and the PHRA.  A harassment claim under the ADA and the PHRA requires Plaintiff to show that:

> (1) [she] is a qualified individual with a disability under the ADA; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability or request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) that [the employer] knew or should have known of the harassment and failed to take prompt effective remedial action.

*Walton*, 168 F.3d at 667.

Defendants argue that Plaintiff has failed to present evidence that satisfies the third or fourth prongs of the standard.  Specifically, Defendants contend that Plaintiff's few examples of unpleasant interactions with co-workers do not amount to harassment because they were not

based on discriminatory animus.  In her Response, Plaintiff does not address Defendants'
arguments with respect to her harassment claims.  We presume that Plaintiff has therefore
abandoned these claims.  However, even if she did not abandon these claims, summary judgment
is nevertheless appropriate.

Plaintiff makes few allegations in support of her harassment claims.  One allegation is
that an employee made a disparaging remark about people with disabilities.  Plaintiff testified
that she overheard a male employee making fun of someone by stating that they had narcissistic
personality disorder.  (Brown Dep. 158-59.)  She also testified that, after she returned from
FMLA leave, another male employee approached her and joked that he only needed a note from
his doctor to take a long vacation.  (*Id*. at 161.)  The first remark was not based on Plaintiff's
disability, and therefore does not meet the standard for harassment.  In fact, Plaintiff testified that
she never heard anyone at Vanguard express any bias towards people who suffered from
depression.  The second remark does not rise to the level of severe or pervasive conduct that
would alter the conditions of employment or create an abusive working environment.  *See Kidd
v. MBNA Am. Bank, N.A.*, 93 F. App'x 399, 402 (3d Cir. 2004) (affirming grant of summary
judgment on hostile work environment claim, and holding that a few isolated, albeit "obnoxious"
comments from a coworker "does not establish that discrimination was pervasive and regular").

Plaintiff also alleges that two of her co-workers—Jones and Gibson—were "abusive" to
her because they were unkind.  Jones was "snippy" with Plaintiff, questioned her design
knowledge, and acted unprofessionally and belittling towards Plaintiff.  (Crew Relations Session
69343; Brown Dep. 180-83.)  Gibson "ripped apart" one of Plaintiff's designs, questioned
Plaintiff's design knowledge, and took over a project that was assigned to Plaintiff.  (Crew
Relations Session 69343; Brown Dep. 184-86.)  Neither of these individuals said anything to

Plaintiff suggesting a bias towards her disability.  (Brown Dep. 183, 187.)  Although their

conduct may have been unkind, it does not constitute harassment.  *See Walton*, 168 F.3d at 667

(holding that harassment must be based on the disability).

Plaintiff also alleges that Chigullapalli's conduct toward her constituted harassment.

Specifically, she alleges that Chigullapalli frequently walked by her desk to see if she was there,

made false accusations about her performance in her reviews, ignored positive comments from

her co-workers about her performance, removed her work-from-home privilege, and criticized

her work.  (Brown Dep. 187-192.)  All of these allegations, by their nature, do not involve

harassment that is related to Plaintiff's disability.  In fact, Plaintiff did not recall Chigullapalli

ever saying anything negative about her disabilities.  All of Plaintiff's allegations concerning

Chigullapalli reveal his attempt to hold Plaintiff accountable for performance deficiencies.

Defendants contend that the record "reflects a patient, professional, and meticulous attempt by

Chigullapalli to hold [Plaintiff] accountable for her performance deficiencies and coach her to

improve."  (Defs.' Mem. 31.)  We agree with this characterization.  At most, Plaintiff has alleged

a complicated relationship between herself and her supervisor.  However, this is not actionable

under the ADA.  *See Walton*, 168 F.3d at 667 ("Although it is clear that the relationship between

[plaintiff] and [her supervisor] was poor, [she] has not asserted facts that would allow a

reasonable jury to find that [her supervisor] harassed her because of her disability.").

Accordingly, summary judgment will also be granted with respect to Plaintiff's claims for

harassment.

**IV.     CONCLUSION**

For these reasons, Defendants' Motion for Summary Judgment will be granted.

An appropriate Order follows.

**BY THE COURT:**

_____

**R. BARCLAY SURRICK, J.**